UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

         v.                                          **DECISION AND ORDER**
                                                     08-CV-361S

WATERMARK FINANCIAL SERVICES GROUP, INC.,
WATERMARK M-ONE HOLDINGS, INC.,
M-ONE FINANCIAL SERVICES, LLC,
WATERMARK CAPITAL GROUP, LLC,
GUY W. GANE, JR.,
LORENZO ALTADONNA,
DEBORAH GALAS,
THOMAS BRICK,

                              Defendants,

GUY W. GANE, III,
JENNA GANE,
DENKON, INC.,

                              Relief Defendants.


## I.  INTRODUCTION

Presently before this Court is the Securities and Exchange Commission's ("the

Commission") Motion for Summary Judgment and for Determination of Civil Penalties and

Disgorgement.  (Docket No. 110.)  For the following reasons, the Commission's motion is

granted in part and denied in part.

## II.  BACKGROUND

Guy W. Gane, Jr. ("Gane") was the president and principal of the Watermark

Defendants[1].  (Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's Statement"),

---

[1]The Watermark Defendants are Watermark Financial Services Group, Inc., Watermark M-One
Holdings, Inc., M-One Financial Services, LLC, and Watermark Capital Group, LLC.

Docket No. 123, ¶ 1.[2])  Gane held Series 7 and 24 securities licenses and operated a broker-dealer office from July 2007 through 2008, at the M-One Financial Services, Inc. ("M-One") offices in Amherst, N.Y., but was not a registered representative at that broker-dealer.  (Id.)  Previously, Gane was a registered representative associated with a series of registered-broker dealers and operated branch offices of those dealers in the M-One offices from October 2002 to April 2007.  (Id.)  Since April 2007, Gane has not been a registered representative associated with any broker-dealer.  (Id.)

Defendant Lorenzo Altadonna worked for Gane at the M-One offices.  He held Series 6 and 63 securities licenses.  (Plaintiff's Statement, ¶ 2.)  The Commission's case against Altadonna has concluded.  Altadonna has consented to a judgment permanently enjoining him from violating the securities laws specified therein and requiring him to pay disgorgement of $1,866,867.90 and prejudgment interest of $205,486.37.  (Docket Nos. 185, 196.)

Thomas Brick and Deborah Galas worked for Gane at the M-One offices.  They have both consented to judgments permanently enjoining them from violating the securities laws specified therein and have agreed that the allegations against them contained in the amended complaint may be deemed true for purposes of this motion.  (Plaintiff's Statement, ¶¶ 3, 4; Docket Nos. 96, 97.)  Their liability has therefore been established and all that remains is to determine the amount of disgorgement and what, if any, civil penalties they must pay.  (Docket Nos. 96, 97.)

---

[2]This Court has confirmed and is satisfied that the record evidence cited in Plaintiff's statement supports the assertions therein.  Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) (holding that factual allegations contained in a Rule 56.1 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

The relief defendants are Denkon, Inc., a Florida corporation owned by Konstantinos Samouilidis; Guy W. Gane, III, who is Gane's son; and Jenna Gane, who is Gane's daughter.[3]   (Plaintiff's Statement, ¶¶ 9-11, 15.)  They are each alleged to have received money derived from the scheme detailed below.

## A.   The Scheme

In January 2006, Gane met with Altadonna, Brick, and Galas in the M-One offices and advised them of his plan to purchase and develop waterfront property by selling debentures and promissory notes that would pay a 10% sales commission and would earn investors a 10% return.  (Plaintiff's Statement, ¶¶ 16, 19, 21, 22, 28.)  Gane signed the debentures and notes and set the 10% interest rate.  (Plaintiff's Statement, ¶¶ 17, 18, 24.)  The debentures were not registered with the Commission.  (Plaintiff's Statement, ¶ 56.)

Gane, Altadonna, Brick, and Galas induced investors to purchase debentures by guaranteeing them that they would earn 10% interest per year.  (Plaintiff's Statement, ¶¶ 20, 21, 28; Affidavit of Deborah Galas ("Galas Aff."), Docket No. 200, ¶¶ 13-15, 17.)  Altadonna sold more than $1 million in debentures or promissory notes from 2007 to May 2008 and personally guaranteed the investments to his clients, telling them that it was impossible for them to lose money and by promising them a one-week time-share in the real estate project that the debentures were supposed to fund.  (Plaintiff's Statement, ¶¶ 23, 28, 34.)  Galas sold $1.3 million dollars in debentures.  (Galas Aff., ¶ 21.)

In addition, Altadonna made exaggerated claims in written communications to his

---

[3]Relief defendants are those persons who "hold the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." S.E.C. v. Colello, 139 F.3d 674, 676 (9th Cir. 1998).  Relief defendants may be joined in a securities enforcement action "to aid the recovery of relief," provided the relief defendant "has no ownership interest in the property which is the subject of litigation." S.E.C. v. George, 426 F.3d 786, 798 (6th Cir. 2005).

debenture and promissory note clients, such as "[t]he words ***risk and loss are not*** in my vocabulary" and "you have done an 11% return in 8 months guaranteed through my company."  (Plaintiff's Statement, ¶ 35 (emphasis in original exhibit).)  And both Altadonna and Gane told investors that their money was in Greece, that lawyers were converting the Euros into dollars, that their money had been deposited in a Florida bank, and that the money was being held up by U.S. Customs.  (Plaintiff's Statement, ¶ 54.)

Gane and Altadonna targeted long-time clients, friends, neighbors, and family members.  (Plaintiff's Statement, ¶ 25.)  They also urged investors to transfer their investments from secure IRA accounts and certificates of deposit into debentures, without disclosing the risks of doing so.  (Plaintiff's Statement, ¶ 26.)

Despite the promises and guarantees, no investor funds were ever used to purchase waterfront property, and Gane and Altadonna knew that no such purchases were being made.  (Plaintiff's Statement, ¶¶ 32, 33.)  Instead, Gane used investor funds for personal and general operating expenses, including paying commissions to Altadonna, Brick, and Galas.  (Plaintiff's Statement, ¶¶ 33, 52.) Gane, Altadonna, Brick, and Galas knew or should have known that the investment return on the debentures was not guaranteed, because proceeds from the sales of the debentures and promissory notes were the only source of funds, and the obligations to investors were significantly larger than the available funds.  (Plaintiff's Statement, ¶ 29.)

By way of example, a local church invested $200,000 in debentures that matured in December 2007.  (Plaintiff's Statement, ¶ 36.)  With interest, Gane owed the church $220,000.  (Plaintiff's Statement, ¶ 37.)  Knowing that they could not pay the church, Gane and Brick met with church officials to persuade them to roll over the debentures so that no

payment would be required.  (Plaintiff's Statement, ¶ 38.)  When the officials insisted on cashing out, Gane convinced them to remain invested by promising them a monthly interest payment and assuring them that they could liquidate their investment at any time. (Plaintiff's Statement, ¶ 39.)  Later, in January 2008, when the church sought to liquidate its investment, Altadonna sold a $200,000 debenture to a different investor, the proceeds from which were used to pay the church.  (Plaintiff's Statement, ¶¶ 40-43.)

M-One never had sufficient cash available to pay the amounts due under the debentures.  (Plaintiff's Statement, ¶ 30.)  The gap between the cash on hand to pay the debenture obligations and the obligations themselves grew exponentially from the time the first debenture was sold.  (Id.)  By August 2006, the gap was more than $1 million, and it grew to more than $6 million by April 2008.  (Id.)  The only way to raise money to pay the existing debenture obligations was to sell more debentures, which is what Gane and Altadonna did.  (Plaintiff's Statement, ¶¶ 31, 45. 52.)  The total amount raised and deposited from the sale of debentures was $5,378,399.99.  (Plaintiff's Statement, ¶ 66.) The total amount raised from the sale of promissory notes was $1,254,937.  (Plaintiff's Statement, ¶ 66.)

Some of the money raised by the sale of the promissory notes and debentures went to the Relief Defendants — Denkon, Inc., Guy W. Gane, III, and Jenna Gane.

In 2007, Gane and Altadonna met with Samouilidis, the owner of Denkon, Inc., to discuss Samouilidis investing in M-One.  (Plaintiff's Statement, ¶ 69.)  Samouilidis was reportedly expecting to receive $5 million from Greece that he wanted to invest in the United States.  (Plaintiff's Statement, ¶ 68.)  Gane and Altadonna wanted the Samouilidis investment to repay the debenture and noteholders, although they did not tell Samouilidis

that.  (Plaintiff's Statement, ¶ 70, 71.)  Samouilidis, in turn, told Gane and Altadonna that he needed financial assistance from them until he received the $5 million from Greece. (Plaintiff's Statement, ¶¶ 72, 74.)  Gane and Altadonna thereafter transferred $200,000 to Samouilidis, which Altadonna secured by convincing his father to invest $200,000, and promising him that it would pay 10% interest guaranteed by M-One and Gane.  (Plaintiff's Statement, ¶¶ 73, 75.)   Gane and Altadonna subsequently transferred an additional $155,000 to Denkon.  (Plaintiff's Statement, ¶ 81; Maya Decl., Docket No. 166-2, ¶ 4.)

Guy W. Gane, III, received $18,720.60 from Watermark entities, which he maintains he earned as an employee.  (Plaintiff's Statement, ¶¶ 83, 86; Affidavit of Guy W. Gane, III, Docket No. 163-2, ¶¶ 4-6, 8.)  Jenna Gane received $15,711.78 from Watermark entities, which she also maintains she earned as an employee.  (Plaintiff's Statement, ¶¶ 84, 86; Affidavit of Jenna Gane, Docket No. 164, ¶¶ 3-7, 9.)

**B.    The Criminal Proceedings**

On March 25, 2010, a federal grand jury indicted Gane and two other corporate officers (Ian Gent and James Lagona[4]) for the conduct discussed above.  (See United States v. Guy W. Gane, Jr., et al., 10-CR-90S.)  After initial discovery and pretrial motions, Gane pled guilty on December 9, 2010, to one count of mail fraud and one count of money laundering.   On September 14, 2011, this Court sentenced Gane to 13 years of incarceration and to pay $6,394,359.37 in restitution jointly and severally with Altadonna and any others convicted in this scheme.

On April 16, 2010, Altadonna appeared before this Court, waived indictment, and

---

[4]Gent and Lagona are not defendants in this case.

pled guilty to a one count felony information charging him with violating securities laws and regulations contained in 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  (See United States v. Lorenzo Altadonna, 10-CR-75S.)  This Court sentenced Altadonna on August 5, 2010, to time served due to Altadonna's documented, life-threatening medical condition — a malignant brain tumor — and to pay $1,866,867.90 in restitution jointly and severally with any individuals convicted in the scheme.

### III.  DISCUSSION AND ANALYSIS

The Commission seeks summary judgment on each of the five causes of action in its amended complaint.  (Docket No. 98.)  In its first and second causes of action, the Commission alleges that Defendants violated the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  In its third cause of action, the Commission alleges that Defendants violated the registration requirements of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).  In its fourth cause of action, the Commission alleges that Gane and Altadonna violated Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a), by selling securities without being associated with a registered broker or dealer.  Finally, the Commission alleges that the Relief Defendants should be ordered to disgorge their ill-gotten gains, plus prejudgment interest.

### A.   Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes, 398 U.S. at 158-59. "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

By rule, judgment may also be entered against a party that fails to respond to a properly filed motion for summary judgment, if appropriate. FED. R. CIV. P. 56 (e)(3). This district's Local Rules provide for similar relief: a nonmoving party's failure to file and serve an answering memorandum or affidavit may constitute grounds for resolving the motion against it. See Local Rule 7 (a)(2)(A) and (a)(3).

Failure to oppose or respond to a motion for summary judgment standing alone, however, does not warrant granting the motion: "the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." See Vt. Teddy Bear Co.,

8

Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244, 246 (2d Cir. 2004) ("failure to respond to [a Rule 56] motion does not alone discharge the burdens imposed on a moving party"); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001).  If the moving party fails to submit evidence sufficient to meet its burden, "summary judgment must be denied even if no opposing evidentiary matter is presented."  Amaker, 274 F.3d at 681.  Consequently, the Second Circuit has emphasized that district courts "'in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'"  Vt. Teddy Bear, 373 F.3d at 246 (quoting Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993)).

**B.    Securities Laws**

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 are collectively referred to as the antifraud provisions of the federal securities laws. VanCook v. S.E.C., 653 F.3d 130, 137 (2d Cir. 2011); S.E.C. v. Parklane Hosiery Co., Inc., 558 F.2d 1083, 1085 n.1 (2d Cir. 1977).  Together, the antifraud provisions make it unlawful to defraud purchasers of securities by, *inter alia*, making misleading or false statements of material fact or omitting material facts.  See 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.

In particular, it is unlawful "to employ any device, scheme, or artifice to defraud" in the offer or sale of securities;  "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;" or "to engage in any transaction, practice, or course of business which

9

operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a); see also 17 C.F.R. § 240.10b-5.

It is also unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).

Sections 5(a) and 5(c) of the Securities Act make it unlawful to offer or sell non-exempt securities that are not registered with the Commission.  See 15 U.S.C. §§ 77e(a) and (c).  In particular, in the absence of a registration statement, it is unlawful to "make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell [a] security through the use or medium of any prospectus or otherwise" and unlawful to "carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  Id.

Section 15(a) of the Exchange Act makes it unlawful for a broker or dealer to induce, or attempt to induce, the purchase or sale of securities using interstate means, unless that broker or dealer is registered with the Commission or is associated with a registered broker or dealer.  See 15 U.S.C. § 78o(a)(1).

1.      Defendants' Liability

a.      Antifraud Provisions

As it relates to the alleged violations of Section 17(a) of the Securities Act and

Section 10(b) and Rule 10b-5 of the Exchange Act, Gane has already admitted through his criminal plea that he defrauded the debenture and note purchasers.  The doctrine of collateral estoppel bars him from relitigating his participation in the scheme.  See United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978) (applying collateral estoppel bar); S.E.C. v. Freeman, 290 F. Supp. 2d 401, 405 (S.D.N.Y. 2003) (similar).

Gane admitted that "he and others acting at his direction, induced prospective investors by telling them that the 'debenture' investment was 'guaranteed' . . . [and] Gane and others acting at his direction falsely and fraudulently told prospective investors that the invested funds would be used to purchase highly appreciating waterfront real estate in Maine, to develop dormitories for a college in Maine, and/or to invest in local start-up businesses."  (Gane Plea Agreement ("Gane Plea"), 10-CR-90S, Docket No. 35, ¶ 5.) Gane further admitted that instead of investing the moneys he collected as promised, he used them "to pay salary and business expenses, including utilities, cleaning services, landscaping, travel, supplies, mortgage, rent, and commissions . . . [and] misappropriated and converted nearly $1,000,000 of investor funds for his own purposes . . .  [and] also provided investor funds to family members."  (Id.)

Altadonna admitted in his plea agreement that he did not tell potential investors "key facts" about the true nature of the debenture and promissory note investments, such as that their money was not going to be invested as promised, but rather, would be used to pay back earlier investors.  (Altadonna Plea Agreement ("Altadonna Plea"), 10-CR-75S, Docket No. 4, ¶ 5.)  He knowingly and intentionally withheld this information because he believed that the investors would not invest if they knew the truth.  (Id.)  He has also admitted that he sold debentures and promissory notes with knowledge that they were not

11

guaranteed, as promised, nor were they used for real estate investment.  (Supplemental Affidavit of Lorenzo Altadonna ("Altadonna Suppl. Aff."), Docket No. 180, ¶¶ 6-7.)  And he has admitted that he used investor money to pay earlier investors.  (Altadonna Suppl. Aff., ¶¶ 8-10, 12, 14, 15.)

The false statements and promises previously discussed were material and intended to induce the investors to purchase debentures and promissory notes. Defendants repeatedly lied to investors, knowingly made false promises, and never disclosed that they were essentially operating a Ponzi scheme.  The undisputed facts show that Gane, Altadonna, Brick, and Galas made these statements knowingly and voluntarily, with intent to deceive and defraud the purchasers.

Finally, it is undisputed that Defendants made these false and misleading statements to investors in the course of offering for sale or selling securities and that the statements also implicated the purchase or sale of securities.

None of the defendants oppose summary judgment on these claims and they have admitted the facts as asserted by the Commission, either overtly or by not opposing the Commission's Rule 56 Statement of Undisputed Facts, including that they acted with the requisite knowledge or scienter.  And Gane's knowledge and misconduct is imputed to the Watermark Defendants because he was president and principal and ran the day-to-day operations.  See S.E.C. v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing individual's awareness of securities laws violations to corporation over which he had "blanket control").

Thus, the undisputed evidence demonstrates that Defendants defrauded the investors, in violation of Section 17(a) of the Securities Act and Section 10(b) and Rule

10b-5 of the Exchange Act.  See 15 U.S.C. § 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.  The Commission's request for summary judgment as to liability on these claims will therefore be granted.

### b.      Sale of Unregistered Securities

As it relates to the alleged violations of § 5 of the Securities Act, Gane admitted in his plea agreement that the debentures and promissory notes that he and the other defendants sold to investors were not registered with the Commission.  (Gane Plea, ¶ 5.) Moreover, the undisputed facts demonstrate that each Defendant, except Watermark Capital Group, LLC, offered and sold unregistered securities.  (Plaintiff's Statement, ¶¶ 55-60.)  No defendant has offered any evidence that the debentures or notes were registered. Thus, the undisputed evidence demonstrates that Defendants (except Watermark Capital Group, LLC) offered and sold unregistered securities through the use of interstate facilities or the mail, in violation of § 5 of the Securities Act.  See 15 U.S.C. § 77e(a) and (c).  The Commission's request for summary judgment as to liability on this claim will therefore be granted.

### c.      Sale of Securities Without Association With Registered Broker or Dealer

As it relates to the alleged violations of § 15(a) of the Exchange Act, Gane and Altadonna have admitted that they were brokers attempting to sell and selling securities without being associated with a registered broker-dealer.  (Plaintiff's Statement, ¶¶ 61-64.) Brick and Galas have conceded liability through their consent judgments.  No defendant has presented any evidence that they were exempt from this requirement.  Thus, the undisputed evidence demonstrates that Defendants violated § 15(a) of the Exchange Act.

See 15 U.S.C. § 77o(a)(1).  The Commission's request for summary judgment as to liability on this claim will therefore be granted.

### 2.    Damages

The Commission argues that it is entitled to the relief sought from Defendants in its amended complaint, which includes injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, and civil penalties.

### a.    Injunctive relief

The Commission requests entry of a permanent injunction barring Defendants from engaging in future violations of federal securities laws.  Section 20(b) of the Securities Act and § 21(d)(1) of the Exchange Act permit the Commission to obtain permanent injunctive relief upon a showing that (1) the defendants violated the securities laws, and (2) there is a reasonable likelihood that they will again do so in the future.   See S.E.C. v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978); S.E.C. v. Anticevic, No. 05 CV 6991 (KMW), 2010 WL 2077196, at *6 (S.D.N.Y. May 14, 2010); 15 U.S.C. §§ 77t(b) and 78(u)(d)(1).

The Second Circuit requires examination of the following factors to determine whether injunctive relief is warranted: (1) the fact that the defendants have engaged in illegal conduct; (2) the degree of scienter involved; (3) the isolated or repeated nature of the violations; (4) the defendants' recognition of the wrongful nature of their conduct, and (5) whether the defendant may be in a position to recidivate.  See S.E.C. v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1998); S.E.C. v. Shehyn, No. 04 CV 2003 LAP, 2010 WL 3290977, at *6 (S.D.N.Y. Aug. 9, 2010).

As discussed above, this Court finds that the undisputed material facts establish that Defendants violated federal securities laws by effectively operating a Ponzi scheme. Defendants did so knowingly and voluntarily, and with the intent to profit from the sale of debentures and notes that they repeatedly and intentionally misrepresented were guaranteed investments, when, in fact, they knew that they were not.  This conduct is egregious and the scheme was extensive.  Moreover, given their training and backgrounds, it is likely that Defendants will be in a position to repeat similar schemes in the future if not enjoined.  Accordingly, this Court will grant a permanent injunction, enjoining Defendants from future violations of the federal securities laws.  The injunctions will be included in the final judgments, if they have not already been imposed.

### b. Disgorgement

Courts are empowered to impose joint and several disgorgement liability on defendants who collaborate in violating the securities laws.  See S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996) ("Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.") Disgorgement serves as a remedy as well as a deterrent, supporting the policy of making violations of the securities laws unprofitable.  See, e.g., S.E.C. v. Wang, 944 F.2d 80, 85 (2d Cir. 1991); S.E.C. v. Manor Nursing Ctrs, Inc., 458 F.2d 1082, 1104 (2d Cir. 1972); S.E.C. v. Elliott, No. 09 Civ. 7594 (RJH), 2011 WL 3586454, at *11 (S.D.N.Y. Aug. 11, 2011).

The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation."  S.E.C. v. Patel, 61 F.3d 137, 139 (2d Cir. 1995).  "Once 'the SEC has satisfied its burden to demonstrate such an approximation, the

15

burden shifts to the defendant to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged.'" <u>S.E.C. v. Universal Express, Inc.</u>, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009) (quoting <u>S.E.C. v. Rosenfeld</u>, No. 97 Civ. 1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001)).

As discussed above, the undisputed facts demonstrate that Gane, Brick, and Galas knowingly participated in the scheme to defraud the debenture and promissory note investors.  Subtracting amounts already paid, the total amount still owed is $5,299,478.21. (Plaintiff's Statement, ¶¶ 66, 67; Declaration of Israel Maya, Docket No. 166-2, ¶ 10.)  This is a reasonable approximation of the profits Defendants realized and none of the defendants have submitted any proof that less was misappropriated.  Other than Altadonna who has already agreed and been directed to disgorge his ill-gotten gains, Defendants will each be jointly and severally liable for $5,299,478.21 in disgorgement.[5]

c.   **Prejudgment Interest**

"In addition to its discretion to order disgorgement, a court has the discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at which such interest should be calculated." <u>Universal Express, Inc.</u>, 646 F. Supp. 2d at 566. "Prejudgment interest is generally calculated at the rate used by the Internal Revenue Service for interest on underpaid taxes under 26 U.S.C. § 6621(a)(2) because '[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.'" <u>S.E.C. v. Aimsi Techs., Inc.</u>, 650 F. Supp. 2d 296, 304 (S.D.N.Y. 2009) (quoting <u>First Jersey</u>

---

[5]This disgorgement figure will be reduced by any payments made by Defendants and the Relief Defendants, some of which have begun.

Secs., 101 F.3d at 1476).

Whether to award prejudgment interest generally turns on "(1) the need to fully compensate the wronged party for actual damages suffered, (2) considerations of fairness and the relative equities of the award, (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court." Commercial Union Assur. Co., PLC v. Milken, 17 F.3d 608, 613 (2d Cir. 1994).

Considering these factors and the nature and extent of the fraudulent scheme, this Court finds that an award of prejudgment interest is both fair and equitable.  Defendants should not be unjustly enriched by an interest-free use of the funds they fraudulently obtained from investors.  An award of prejudgment interest will therefore be included in the final judgments.

### d.   Civil Penalties

Section 20 of the Securities Act provides that "the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 77t(d)(1).  These penalties, like an award of disgorgement and prejudgment interest, are designed to deter and render unprofitable the violation of the federal securities laws.  See S.E.C. v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998).

There are three tiers of civil penalties.  The first tier provides that "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances."  15 U.S.C. § 77t(d)(2)(A).  The second tier provides that the court can award up to "$50,000 for a natural person or $250,000 for any other person" or "the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C.

17

§ 77t(d)(2)(B).   The third tier provides that the court can award up to "$100,000 for a natural person or $500,000 for any other person" or "the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement . . . and . . . resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 77t(d)(2)(C).

To determine which tier is appropriate, courts consider the same factors relevant to determining whether to award injunctive relief: (1) the egregiousness of the conduct; (2) the degree of scienter; (3) the extent of the loss or risk of loss; (4) the isolated or recurrent nature of the conduct; and (5) the defendants' demonstrated current and future financial condition.  See S.E.C. v. Credit Bancorp, Ltd, 738 F. Supp. 2d 376, 391 (S.D.N.Y. 2010); S.E.C. v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

For substantially the same reasons that this Court will grant injunctive relief, it finds that third-tier civil penalties are also warranted against Brick and Galas.[6]  All of the defendants targeted friends, family members, and at least one religious institution, and went so far as to convince individuals to leave secure investments to purchase debentures or promissory notes that Defendants knew were not guaranteed or to be used for real estate development projects.  Defendants employed fraudulent, deceitful, and manipulative tactics and caused substantial losses to the investors.  Civil penalties of $100,000 pursuant to 15 U.S.C. § 77t(d)(2)(C) are therefore warranted.  See S.E.C. v. Global Telecom Svcs., 325 F. Supp. 2d 94 (D. Conn. 2004) (awarding $100,000 in civil penalties against

_____

[6]In light of their felony criminal convictions, the Commission no longer seeks civil penalties against Gane and Altadonna.

individuals involved in $742,000 fraud); S.E.C. v. Robinson, No. 00 Civ. 7452, 2002 WL 1552049 (S.D.N.Y. July 16, 2002) (awarding $100,000 for $420,000 fraud); S.E.C. v. Friendly Power, 49 F. Supp. 2d 1363, 1366 (S.D. Fla. 1999) (awarding $100,000 for $2.4 million fraud).

### 3.    Relief Defendants' Disgorgement

A court may order disgorgement from a relief defendant upon a finding that the relief defendant "(1) is in possession of ill-gotten funds, and (2) lacks a legitimate claim to those funds." Commodity Futures Trading Com'n v. Walsh, 618 F.3d 218, 225 (2d Cir. 2010). If a relief defendant establishes a legitimate claim to the funds in his or her possession, they are not subject to disgorgement. See id. at 226-27. "A relief defendant can show a legitimate claim to the funds received by showing that some services were performed in consideration for the monies." F.T.C. v. Bronson Partners, LLC, 674 F. Supp. 2d 373, 392 (D. Conn. 2009).

As to Denkon, Inc. and its principal, Samouilidis, this Court has already ordered that they disgorge $617,000 in investor funds that they received. (Docket No. 62.) Since that time, the investigation has revealed that Denkon, Inc. and Samouilidis received an additional $355,000 as a result of the fraud. (Plaintiff's Statement, ¶ 73; Maya Decl., Docket No. 166-2, ¶¶ 2-6.) There is no evidence that this transfer was a legitimate loan or made for consideration. (Plaintiff's Statement, ¶ 77.) Denkon, Inc. and Samouilidis will therefore be jointly and severally liable to disgorge an additional $355,000, for a total of $972,000, plus prejudgment interest.

As to Guy W. Gane, III, and Jenna Gane, the Commission contends that they

received $18,720.60 and $15,711.78, respectively, without providing any valuable consideration. (Plaintiff's Statement, ¶¶ 83, 84.)  These two Relief Defendants admit that they received these moneys, but maintain that they were legitimately employed by the Watermark Defendants and earned these moneys as wages.  (Plaintiff's Statement, ¶ 86; Relief Defendants Guy W. Gane, III and Jenna Gane's Response to Plaintiff's Rule 56 Statement of Undisputed Facts ("Gane III and J. Gane's Statement"), Docket No. 162, ¶¶ 83-85.)

The Commission's evidence in support of disgorgement indicates that the moneys were paid between April 2005 and April 2008.  (Declaration of Israel Maya, Docket No. 111, Exhibit D.)  Guy W. Gane, III, worked at Watermark from May 2005 through May 2008.  (Gane III and J. Gane's Statement, ¶ 85; Affidavit of Guy W. Gane, III, Docket No. 163-2, ¶ 4.)  Jenna Gane worked at Watermark from May 2005 through May 2008.  (Gane III and J. Gane's Statement, ¶ 85; Affidavit of Jenna Gane, Docket No. 164, ¶ 5.)  The fraud in this case did not start until January 2006.  (Plaintiff's Statement, ¶ 16.)  There is thus an issue of fact concerning when Guy W. Gane, III and Jenna Gane received these moneys and whether they provided legitimate services as consideration.  See Bronson Partners, LLC, 674 F. Supp. 2d at 392.  Summary judgment is therefore precluded and will be denied.

## IV. CONCLUSION

For the reasons stated above, the Commission's Motion for Summary Judgment will be granted in part and denied in part, and individual final judgments consistent with this decision will be filed.

## V.  ORDERS

IT HEREBY IS ORDERED, that the Commission's Motion for Summary Judgment (Docket No. 110) is GRANTED in part and DENIED in part.

FURTHER, that Final Judgments consistent with this decision will be filed separately as to Guy W. Gane, Jr. and the Watermark Defendants, Deborah Galas, Thomas Brick, and Denkon, Inc./Konstantinos Samouilidis.

FURTHER, that the Commission shall file a status memorandum on or before February 29, 2012, advising as to how it intends to proceed as to Relief Defendants Guy W. Gane, III, and Jenna Gane.

SO ORDERED.


Dated:        February 10, 2012
              Buffalo, New York



                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Chief Judge
                                        United States District Court